CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 0 9 2007

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

CYNTHIA E. MILLER,                    )
                                      )
        Plaintiff,                    )        Civil Action No. 5:06CV00053
                                      )
v.                                    )        **MEMORANDUM OPINION**
                                      )
COUNTY OF ROCKINGHAM, et al.,         )        By: Hon. Glen E. Conrad
                                      )        United States District Judge
        Defendants.                   )

Cynthia E. Miller filed this action under the Family and Medical Leave Act of 1993

(FMLA), 29 U.S.C. §§ 2601-2654, against the County of Rockingham, the Upper Valley

Regional Park Authority ("Park Authority"), the County of Augusta, the City of Harrisonburg,

the City of Staunton, and Andrew Wells, the Park Authority's Executive Director.[1]  The case is

presently before the court on the motion for summary judgment filed by the Counties, as well as

the motion for summary judgment filed by the Park Authority.  For the reasons that follow, the

court will grant the Counties' motion and deny the Park Authority's motion.

### Background

Miller is a resident of Page County.  In March of 2000, she was hired to work as a

Caverns Operator at Grand Caverns Regional Park ("Grand Caverns") in Grottoes, Virginia.  The

following December, Miller was promoted to Park Manager by David Leatherwood, the former

Executive Director of the Park Authority.  She maintained that position until June 18, 2004, the

date on which her employment was terminated.  On April 15, 2004, two months prior to her

termination, Miller's stepson was seriously injured in an ATV accident.  He was placed in a

---

[1]By order entered March 6, 2007, the City of Harrisonburg and the City of Staunton were
dismissed from the case pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure.  By opinion
and order entered March 30, 2007, the court granted Wells' motion to dismiss.

medically induced coma for approximately thirty days. During one of her visits to the hospital, Miller learned about the FMLA. She subsequently submitted two requests for FMLA leave, the first on May 20, 2004 and the second on June 14, 2004. Both requests were denied by Andrew Wells, the current Executive Director of the Park Authority. Miller was terminated four days after she made the second request.

In the present action, Miller alleges that she was employed by both the Park Authority and the Counties, and that she was an "eligible employee" under the FMLA, entitling her to FMLA leave. Miller further alleges that her employment was terminated in retaliation for exercising her rights under the FMLA.

A.     **The Park Authority and the Counties**

The Park Authority was created and incorporated in 1966, pursuant to a Resolution and Articles of Incorporation adopted by the Board of Supervisors of the County of Rockingham and the City Council of the City of Harrisonburg, as authorized by the Park Authorities Act, Va. Code § 15.2-5700 - 15.2-5714. Since 1967, the Park Authority's member jurisdictions have consisted of the County of Rockingham, the City of Harrisonburg, the County of Augusta, and the City of Staunton. The Park Authority operates two parks, Grand Caverns and Natural Chimneys Regional Park, near Bridgewater, Virginia.

The Park Authority, through its Executive Director, is fully responsible for its parks' operation and maintenance, and its employees. As set forth in the Park Authority's By-laws:

> The Regional Parks Superintendent [Executive Director] shall be
> appointed by the Board to serve as the chief officer of the staff,
> responsible for the maintenance and operation of the Authority's
> offices and parks, acting under the immediate direction of the
> Board. He (or she) is responsible for carrying out the programs

2

and policies of the Authority in accordance with its Articles of
Incorporation and by-laws. He shall supervise staff and consultant
services, prepare a proposed annual budget and work program in
consultation with the Finance Committee and administer and
control the approved budget. He shall have the authority to recruit,
employ, assign, supervise, and terminate for just cause employees
of the Authority within the framework of policies established and
adopted by the Board. He shall keep the Board members informed
on local state, and federal matters which affect the policies and
operations of the Authority. He shall perform such other duties
consonant with his position which may be delegated to him by the
Board.

(Wells Aff. Ex. 1, Park Authority By-laws.)

The Park Authority's employees are further governed by the provisions of the Park

Authority's own Personnel Handbook. The Personnel Handbook explains, in pertinent part, as

follows:

The Board of Directors is empowered under the Code of the State
of Virginia to establish departments, to employ personnel and to
set salaries. These regulations are intended to cover all facets of
the Authority's Personnel Management System in accordance with
that grant of authority. Such authority has been delegated to the
Authority Director. Rules, regulations, and other administrative
provisions for personnel administration are established for the
information and guidance of the Upper Valley Regional Park
Authority (UVRPA) employees and are set out in these Personnel
Rules and Regulations.

(Personnel Handbook at p. 2.) The Personnel Handbook addresses all aspects of the employment

of the Park Authority's employees, including employment qualifications, personnel records,

employee evaluations, procedures for various types of leave, employee benefits, standards of

conduct, employee discipline, and the Park Authority's grievance procedure.

The Park Authority handles all of its own employee recruitment and makes its own

determinations as to the rate of pay and benefits offered to its employees. Neither the County of

3

Rockingham nor the County of Augusta, nor any other member jurisdiction, has any control, authority, or supervision over any Park Authority employee.

The Park Authority has its own workers' compensation insurance plan for its employees and handles its employees' workers' compensation claims. The Park Authority also has its own unemployment insurance, its own motor vehicle insurance, and its own liability insurance.

The Park Authority owns the property on which its parks are located, and is solely responsible for creating and meeting its own budget. When preparing a proposed annual budget for the Park Authority, the Executive Director requests a certain level of funding support from the Park Authority's member jurisdictions. The members are not obligated to honor the Executive Director's request, and may contribute as much, or as little, as they wish. The members have, on numerous occasions, contributed significantly less than the amount requested by the Park Authority. The Park Authority's financial statements for the fiscal year ending September 30, 2004 indicate that the combined financial contributions from its member jurisdictions constituted less than fifteen percent of the Park Authority's operating revenue budget.[2]

As permitted by the Park Authorities Act, Va. Code § 15.2-5710, and the Park Authority's By-laws, the County of Rockingham and the County of Augusta have each served as the Park Authority's fiscal agent. The County of Augusta served as the Park Authority's fiscal agent for many years, but ceased doing so after June 30, 2002. On July 1, 2002, the County of

---

[2]The County of Rockingham and the County of Augusta each contributed $38,000 for the fiscal year 2003-2004, whereas the Park Authority had operating revenues for that same period totaling $482,806 from park admissions, camping fees, gift shop sales, pool fees and concessions, group contracts and facility rentals, and other facility income.

4

Rockingham began serving as the Park Authority's fiscal agent. As fiscal agent, the County of Rockingham processes and issues paychecks for the Park Authority's employees, which are computer-generated biweekly based on the employees' timesheets that the Park Authority approves and faxes to the County's offices in Harrisonburg. The County of Rockingham also performs the same task with respect to the Park Authority's accounts payable. Specifically, the Park Authority faxes vouchers to the County with attached invoices that the Park Authority has approved for payment, and the County performs the task of cutting the checks for the payments that the Park Authority has approved to be made. Every month, at the beginning of the month, an electronic transfer is made from the Park Authority's bank account to the County of Rockingham to reimburse the County for the total amount of payments that was processed on behalf of the Park Authority for the previous month.

As the Park Authority's fiscal agent, the County of Rockingham files the Park Authority's W-2 information with the Internal Revenue Service. Although the Park Authority has its own federal tax identification number, the County of Rockingham uses its own number in its role as fiscal agent. Because the County of Rockingham is able to obtain group health insurance at a better rate than individuals or smaller groups are able to negotiate, the Park Authority began obtaining health insurance for its employees through the County's group plan when the County became the Authority's fiscal agent.[3] The Park Authority has also obtained Virginia Retirement System benefits for its employees by virtue of the County of Rockingham serving as the Authority's fiscal agent, as it had when the County of Augusta served as its fiscal agent.

---

[3]Likewise, the Park Authority had previously obtained health insurance for its employees through the County of Augusta's group plan.

5

However, no unreimbursed funds have ever been used to pay for any insurance, retirement, or other benefits provided to the Park Authority's employees.

Neither the County of Rockingham nor the County of Augusta receives a discount when it uses the Park Authority's premises and facilities. When the Counties have used the Park Authority's premises and facilities in the past, they have had to enter into a contract with the Park Authority and provide a non-refundable reservation deposit.

**B.      Miller's Employment with the Park Authority**

As previously stated, Miller began working at Grand Caverns in March of 2000, first as a Caverns Operator and later as Park Manager. Miller worked exclusively on the premises of the Park Authority. The Park Authority, through its Executive Director, interviewed, hired, and trained Miller; determined her rate of pay, benefits, work schedule, and job duties; evaluated her job performance; and ultimately terminated her.

**Statutory and Regulatory Framework**

The Counties and the Park Authority have now filed motions for summary judgment. Both the Counties and the Park Authority argue that the Park Authority was Miller's sole employer. Additionally, the Park Authority argues that it did not employ 50 or more employees during the relevant time period, and thus, that Miller was not an "eligible employee" under the FMLA.

The FMLA authorizes "eligible employees" to take up to twelve weeks of unpaid leave per year for qualifying medical or family reasons, 29 U.S.C. § 2612(a)(1), and ensures that employees will be restored to the same or equivalent positions upon returning to work, 29 U.S.C. § 2614(a)(1). The statute creates a private right of action entitling "eligible employees" to seek

6

equitable relief and monetary damages "against any employer (including a public agency) in any Federal or State court of competent jurisdiction," 29 U.S.C. § 2617(a)(2), should that employer "interfere with, restrain, or deny the exercise of" FMLA rights, 29 U.S.C. § 2615(a)(1). The statute also prohibits employers from discharging or discriminating against an employee "for opposing any practice made unlawful by" the FMLA. 29 U.S.C. § 2615(a)(2).

The FMLA expressly incorporates into its provisions the Fair Labor Standards Act's ("FLSA"), 29 U.S.C. §§ 201-219, definition of "employee." See 29 U.S.C. § 2611(3). The FLSA defines "employee" as "any individual employed by an employer," which generally includes "any individual employed by a State, political subdivision of a State or an interstate governmental agency." 29 U.S.C. § 203(e)(1) and (2)(C). An "eligible employee" under the FMLA is an "employee" who "has been employed for at least 12 months by the employer with respect to whom leave is requested," and "for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). Additionally, the FMLA excludes from eligibility "any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that work site is less than 50." 29 U.S.C. § 2611(2)(B). The term "employer" includes any public agency, 29 U.S.C. § 2611(4)(A)(iii), and "public agency" includes "the government of a State or political subdivision thereof" and "any agency of . . . a State, or a political subdivision of a State," 29 U.S.C. §§ 203(x) and 2611(4)(A)(iii).

When determining the identity of an individual's employer for purposes of the FMLA, the FMLA's accompanying regulations provide that "[n]ormally the legal entity which employs the

7

employee is the employer under the FMLA." 29 C.F.R. § 825.104(c). The regulations contain a specific provision regarding the status of public entities. Pursuant to § 825.108(c)(1), "[w]here there is any question about whether a public entity is a distinct public agency, as distinguished from a part of another public agency, the U.S. Bureau of the Census' 'Census of Governments' will be determinative, except for new entities formed since the most recent publication of the 'Census.'" 29 C.F.R. § 108(c)(1).

The regulations also contain provisions pertaining to "joint" and "integrated" employment. Pursuant to § 825.104(c)(2), "[s]eparate entities will be deemed to be parts of a single employer for purposes of FMLA if they meet the 'integrated employer' test," and "[w]here this test is met, the employees of all entities making up the integrated employer will be counted in determining employer coverage and employee eligibility." 29 C.F.R. § 825.104(c)(2). In addressing how joint employment is treated under the FMLA, § 825.106(a) provides that "[w]here two or more businesses exercise some control over the work or working conditions of the employee, the businesses may be joint employers under the FMLA." 29 C.F.R. § 106(a).

## Standard of Review

An award of summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining

8

whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indust., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

## The Counties' Motion for Summary Judgment

The Counties argue that the Park Authority was Miller's sole employer at the time that she was terminated, and that she was not employed by either of the Counties. Specifically, the Counties argue that the Park Authority is an independent entity under 29 C.F.R. § 825.108(c)(1) and Virginia law, and that the Counties were not Miller's employer under either the integrated employer test or the joint employer test. For the following reasons, the court agrees with each of these arguments.

### A.    The Public Agency Regulation

As previously stated, the FMLA's accompanying regulations include a regulation that specifically addresses whether a public agency is "a single public agency and, therefore, a single employer for purposes of determining employee eligibility." 29 C.F.R. § 825.108(c)(1). The regulation provides, in pertinent part, as follows:

> A State or a political subdivision of a State constitutes a single public agency and, therefore, a single employer for purposes of determining employee eligibility. For example, a State is a single employer; a county is a single employer; a city or town is a single employer. *Where there is any question about whether a public entity is a public agency, as distinguished from a part of another public agency, the U.S. Bureau of the Census' "Census of Governments" will be determinative, except for new entities formed since the most recent publication of the "Census."* For new entities, the criteria used by the Bureau of Census will be used to determine whether an entity is a public agency or a part of another agency, including existence as an organized entity, governmental character, and substantial autonomy of the entity.

9

Id. (emphasis added).

Section 825.108(c)(1) has been interpreted and applied by the United States Court of Appeals for the Sixth Circuit and the United States Court of Appeals for the Seventh Circuit. In Rollins v. Wilson County Gov't, 154 F.3d 626 (6th Cir. 1998), the Sixth Circuit interpreted the regulation as requiring it to first determine whether state law definitively resolved the status of a public entity, and to rely on the "Census of Governments" only when the entity's status could not be resolved under state law.  See Rollins, 154 F.3d at 629 (ultimately holding that Tennessee law definitively resolved the status of the Wilson County School System and the Wilson County Government's Finance Department). In Fain v. Wayne County Auditor's Office, 388 F.3d 257 (7th Cir. 2004), the Seventh Circuit emphasized that "the Rollins approach has the benefit of giving meaning to all of the words of the regulations," and that, "[a]s Rollins noted, if the Census were to control in all instances, the regulations could have said that much more clearly." Fain, 388 F.3d at 260.  Nonetheless, the Seventh Circuit ultimately found it unnecessary to resolve the issue, since Indiana law did not definitively resolve the question of whether a county auditor's office was a separate public agency, and thus, the "Census of Governments" was determinative. Id. at 260-263.

In this case, the court agrees with the Counties that the Park Authority is an independent public entity under Virginia law and that, even if there is any question as to the Park Authority's status, the "Census of Governments" is determinative for purposes of § 825.108(c)(1).  It is undisputed that the "Census of Governments" establishes that the Park Authority is a distinct public entity.  Consequently, because Virginia law and the "Census of Governments" provide the same result, this court, like Seventh Circuit in Fain, need not resolve the issue of whether the

"Census of Governments" is controlling only in those instances in which there is no definitive answer under state law.

As previously stated, the Park Authority was created and incorporated in 1966, pursuant the Park Authorities Act, Va. Code § 15.2-5700 - 15.2-5714. The Act expressly provides that each authority, once created by an ordinance or resolution, "shall be a body politic and corporate," Va. Code § 15.2-5702, governed by its own Board of Directors, Va. Code § 15.2-5703. The Act further provides that each authority is authorized to adopt its own by-laws; adopt its own official seal; maintain its own office; sue and be sued; acquire land; regulate the use of land; issue bonds; accept grants and gifts from federal, state and local governments; enter into contracts; borrow money; adopt rules and regulations concerning the use of its properties; and otherwise "do all acts and things necessary or convenient to carry out the powers granted by [the Act]." Va. Code § 15.2-5704. Thus, the Act establishes in no uncertain terms that Virginia park authorities, like the Park Authority, are independent public entities.

In response, Miller argues that the Park Authority is not an independent entity under Virginia law. To support her argument, Miller relies on the Supreme Court of Virginia's decision in Prendergast v. Northern Va. Reg. Park Authority, 227 Va. 190, 313 S.E.2d 399 (Va. 1984). In Prendergast, the Supreme Court addressed the issue of whether the Northern Virginia Regional Park Authority was entitled to sovereign immunity in a tort action. Prendergast, 227 Va. at 193, 313 S.E.2d at 400. In holding that the Park Authority was not an arm of the Commonwealth, and thus, not entitled to sovereign immunity, the Court noted that it "was not directly created by the Commonwealth," and that "[i]t is a creature of one or more localities and is essentially subject to their control." Id., 227 Va. at 194, 313 S.E.2d at 401.

11

Having reviewed the <u>Prendergast</u> decision, the court disagrees with Miller's assertion that the Supreme Court's sovereign immunity analysis unequivocally resolves the Park Authority's status. The determination that a park authority is not an arm of the Commonwealth entitled to sovereign immunity does not affirmatively establish that the Park Authority is merely a part of the Counties, rather than an independent public entity. While park authorities are indeed created by localities, the Park Authorities Act clearly establishes that, upon their creation, they operate as separate and distinct public entities.

Nonetheless, even assuming that the <u>Prendergast</u> decision creates a "question" as to whether or not the Park Authority is a distinct public entity, for purposes of 29 C.F.R. § 825.108(c)(1), the "Census of Governments" supports the proposition that the Park Authority is distinct and independent. It is undisputed that the 2002 "Census of Governments" indicates that, in Virginia, park authorities that are formed by more than one county or municipality are special district governments, which are considered separate, independent governmental units.

Since the "Census of Governments" also favors the Counties, Miller goes on to argue that the Park Authority was fundamentally altered as of July 1, 2002, when its fiscal agent rotated from the County of Augusta to the County of Rockingham, and thus, that the "Census of Governments" should be disregarded and the status of the Park Authority determined anew. However, Miller has failed to provide sufficient evidence to establish that the Park Authority became an entirely "new entity" for purposes of § 825.108(c)(1), as a result of the change in fiscal agency. While David Leatherwood, the former Executive Director of the Park Authority, described the transition as being "hell for [the Park Authority]," he later explained that the Park

Authority merely had to change the way that it classified some of its expenses, since the County of Augusta and the County of Rockingham used two different accounting systems. (Leatherwood Dep. at 41.) The proposition that the Park Authority became a new entity as a result of the change in fiscal agency is further belied by a memorandum that Leatherwood sent to full-time staff following the change. The memorandum advised employees that Rockingham County had different requirements for submitting time sheets, but that "<u>nothing</u> [had] changed regarding overtime or any other aspect of [the employees'] employment." (Counties' Reply Mem. Ex. C.) (emphasis added).

Based on the foregoing, the court concludes that the Park Authority did not become an entirely new entity when the County of Rockingham became its fiscal agent in 2002, and that the Park Authority is a separate and distinct public entity under § 825.108(c)(1).

**B.**     **The Integrated Employer and Joint Employer Tests**

Although § 825.108(c)(1) specifically addresses the issue of when a public agency is "a single public agency and, therefore, a single employer for purposes of determining employee eligibility," Miller seeks to have the court apply the integrated employer test set forth in 29 C.F.R. § 825.104(c)(2) and the joint employer test set forth in 29 C.F.R. § 825.106. The Counties persuasively argue that neither test should be applied in this case, given the fact that there is a separate regulation pertaining to public agencies. Nonetheless, even if the tests should be applied to public entities, the court agrees with the Counties that they were not Miller's employer under either the integrated employer or the joint employer test.

13

### 1.    The Counties were not Miller's employer under the integrated employer test.

In determining whether two or more entities are an integrated employer, § 825.104(c)(2) sets forth several factors for consideration, including (1) common management; (2) interrelation between operations; (3) centralized control of labor relations; and (4) the degree of common ownership or financial control. 29 C.F.R. § 825.104(c)(2). While "no single factor is conclusive," Id., the United States Court of Appeals for the Fourth Circuit has indicated that the "control of labor operations is the most critical factor." Hukill v. Auto Care, Inc., 192 F.3d 437, 442 (4th Cir. 1999).

With respect to common management, the Park Authority is managed entirely by its own Executive Director, which is independently selected by its own Board of Directors. The Board delegates to the Executive Director the day-to-day management of the Park Authority in all respects. Although the Board of Directors includes certain municipal officials from the member jurisdictions, there is no evidence that the Counties or the other member jurisdictions control the Park Authority, the Board of Directors, or the Executive Director. To the contrary, David Wigginton, a City of Harrisonburg employee who has been a member of the Board of Directors since 1995, testified at his deposition that he and the other Harrisonburg representatives "never [received] any direction from [their] supervisors . . . as far as how to vote or how to proceed." (Wigginton Dep. at 16.) Wigginton's testimony is corroborated by an affidavit from Joseph Paxton, a long-time member of the Board of Directors who serves as the County Administrator for the County of Rockingham. In his affidavit, Paxton avers that "[n]either Rockingham County

14

nor any other locality controls the Authority, the Authority's Board of Directors, the Authority

Executive Director . . . , nor any Authority employee." (Paxton Aff. at 2.)

With respect to the interrelation of operations, the operations of the Park Authority and the Counties are interrelated solely to the extent that each County has served at different times as fiscal agent for the Authority. While the fiscal agency relationship demonstrates some interrelation of operations between the Park Authority and the Counties, "this evidence is pale in comparison to the evidence indicating that each [entity] operates separately and distinctly." Hukill, 192 F.3d at 443. As the Fourth Circuit explained in Hukill, a certain degree of integration of operations is "not unusual in today's business climate and is of no consequence." Id.

With respect to "the most critical factor," which is the control of labor relations, Hukill, 192 F.3d at 442, there is absolutely no evidence that the control of labor relations is centralized. The Park Authority has no role in the Counties' labor relations, and there is no evidence that the Counties have any control over the labor relations of the Park Authority. As previously stated, the Park Authority is managed in all respects by an independent Board of Directors, which independently hires an Executive Director, who handles all employment matters and other day-to-day operations. The Park Authority does not have any control over the Counties' employees and the Counties do not have any control over the Park Authority's employees. Although each County, when serving as the Park Authority's fiscal agent, issues pay checks for the Park Authority's employees, the County acting as fiscal agent is fully reimbursed each month for the

payroll expenditures.[4]  See Greason v. Southeastern R.R. Assoc. Bureaus, 650 F. Supp. 1, 4

(N.D. Ga. 1986) (holding that the defendant fiscal agent was not the plaintiff's employer under

the integrated employer doctrine, where although the fiscal agent provided accounting services

and issued pay checks, nothing in the record indicated that the fiscal agent used its own funds for

these activities, or controlled, managed, supervised, or otherwise affected the plaintiff's

employer's labor practices).

Finally, with respect to the degree of common ownership or financial control, the

evidence indicates that the Park Authority and the Counties do not share common ownership or

have financial control over each other.  The Park Authority owns all of its own property and the

Counties have to enter into contracts and pay to use the park facilities.  Although the Counties

have made annual voluntary contributions to the Park Authority, the Park Authority has

substantial assets and income wholly apart from the Counties' contributions.  As previously

stated, the record indicates that for the fiscal year 2004, all of the localities combined made

financial contributions totaling less than fifteen percent of the Park Authority's operating

revenues budget.  Rockingham and Augusta County each contributed only $38,000, whereas the

Authority had revenues totaling $482,806 from sources entirely separate from the locality

---

[4]Miller makes much of the fact that the Park Authority does not pay any interest for the brief
period of time from when the County of Rockingham, as fiscal agent, cuts checks for payments that the
Park Authority has authorized, and when the County is reimbursed for those payments by electronic
transfer from the Park Authority's bank account.  However, the County's Director of Finance, James
Allmendinger, explains in a reply affidavit that "[i]t would cost Rockingham County more to develop and
implement the procedures – with the attendant computer software, programming and other expenses and
burdens that would necessitate – to calculate and collect such inconsequential amounts of 'interest' from
the Authority on an ongoing basis than Rockingham County would receive by doing so."  (Allmendinger
Reply Aff. at 1.)

contributions. The Counties' voluntary financial contributions do not establish that they have financial control over the Park Authority.[5]

Based on the foregoing, and the fact that no entity other than the Park Authority made the final decision to terminate Miller's employment, the court concludes that the Counties were not Miller's employer under the integrated employer test. See Hukill, 192 F.3d at 444 ("It has been said that the 'integrated employer' test instructs a court to determine 'what entity made the final decisions regarding employment matters related to the person claiming discrimination.'") (quoting Trevino v. Celanese Corp., 701 F.2d 397, 404 (5th Cir. 1983)).

### 2. The Counties were not Miller's employer under the joint employer test.

The joint employer test is set forth in 29 C.F.R. § 825.106. The regulation provides, in pertinent part, as follows:

> (a)    Where two or more businesses exercise some control over the work or working conditions of the employee, the businesses may be joint employers under FMLA. Joint employers may be separate and distinct entities with separate owners, managers and facilities. Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:
>
> (1) Where there is an arrangement between employers to share an employee's services or to interchange employees;
>
> (2) Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee; or,

---

[5]The court notes that, to the contrary, Andrew Wells testified during his deposition that the Park Authority "could function [without the member jurisdictions' contributions] with a change in staffing levels and a change in operation . . . ." (Wells Dep. at 59.)

17

(3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer.

(b)     A determination of whether or not a joint employment relationship exists is not determined by the application of any single criterion, but rather the entire relationship is to be viewed in its totality. For example, joint employment will ordinarily be found to exist when a temporary or leasing agency supplies employees to a second employer.

29 C.F.R. § 825.106.

Courts have recognized that this regulation "does not provide much guidance in defining the exact boundaries of a joint employment relationship," Schubert v. Bethesda Health Group, 319 F. Supp. 2d 963, 970 (E.D. Mo. 2004), and there is little case law interpreting the question of joint employment under the FMLA. The United States Court of Appeals for the Ninth Circuit and a few district courts which have addressed the regulation have relied upon case law interpreting joint employment under the FLSA. See Moreau v. Air France, 356 F.3d 942, 946-947 (9th Cir. 2004); Schubert v. Bethesda Health Group, Inc., 319 F. Supp. 2d 963, 970 (E.D. Mo. 2004); Cruz-Lovo v. Ryder System, 298 F. Supp. 2d 1248, 1255-1256 (S.D. Fl. 2003).

In Schultz v. Capital Int'l Sec., Inc., 460 F.3d 595, 603 (4th Cir. 2006), an FLSA case, the Fourth Circuit recognized that, "in some cases," it may be useful for a court to consider factors identified by other courts for use in evaluating the issue of joint employment, such as those identified by the Ninth Circuit in Bonnette v. California Health & Welfare Agency, 704 F.2d 1465, 1469-1470 (9th Cir. 1983).[6] In Bonnette, the Ninth Circuit applied a four-factor test,

_____

[6]In addition to Bonnette, the Fourth Circuit cited the United States Court of Appeals for the Second Circuit's decision in Zheng v. Liberty Apparel Co. Inc., 355 F.3d 61,72 (2d Cir. 2003), in which

examining whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. Bonnette, 704 F.2d at 1469-1470.

This same test was cited by the United States District Court for the Central District of Illinois in Moldenhauer v. Tazewell-Pekin Consol. Communications Ctr., 2006 U.S. Dist. LEXIS 93896 (C.D. Ill. Dec. 29, 2006), an FMLA case relied upon by the Counties. In Moldenhauer, the Court held that no joint employment relationship existed between the City of Pekin or the County of Tazewell and the dispatch service that employed the plaintiff. Moldenhauer, 2006 U.S. Dist. LEXIS 93896 at *37. This was despite the fact that the dispatch service was formed pursuant to an agreement between the municipalities; the dispatch service's board of directors included certain municipal officials; and the dispatch service received a "bulk" of its operating budget from the municipalities. Id. at *4-6. Additionally, the plaintiff was considered a City employee for purposes of payroll, health care insurance, workers compensation insurance, and retirement benefits, and her W-2 forms stated that the City was her employer. Id. at *26-28. The court emphasized that although the City and the County formed the dispatch service and funded most of its budget, the "creation and funding of a separate entity are not enough to constitute an employment relationship under the FMLA, which turns on the extent to which an entity

_____

the Second Circuit listed six factors relevant to the joint employment inquiry: (1) whether the plaintiffs used the entity's premises and equipment for their work; (2) whether the labor contractor had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which the plaintiffs performed a discrete line-job that was integral to the entity's process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the entity or its agents supervised the plaintiffs' work; and (6) whether the plaintiffs worked exclusively or predominantly for the entity.

19

supervised and controlled an employee, including the decisions to hire and fire." Id. at *36. The court further emphasized that the City's role as a vendor for administrative services and a lender of funds to the dispatch service was not controlling evidence of a joint employment relationship. Id. at *32. Finally, the court emphasized that although municipal officials served on the Board of Directors of the dispatch service, there was no evidence that either the City or the County dictated or controlled the terms and conditions of the plaintiff's employment. Id. at *33. See also Heasley v. Carter's for Kids, 2006 U.S. Dist. LEXIS 48140, *4-6 (M.D. Tenn. July 5, 2006) (holding that there was no joint employer relationship between two entities for FMLA purposes, despite the plaintiff's employer's purchase of another entity in its entirety, since the plaintiff did not work on the new entity's premises, and the new entity did not have any power to fire, hire, or modify the plaintiff's employment conditions).

In response to the Counties' arguments regarding the joint employment test, Miller relies on two cases, Antenor v. D & S Farms, 88 F.3d 925 (11th Cir. 1996) and Cruz-Lovo v. Ryder Sys., 298 F. Supp. 2d 1248 (S.D. Fla. 2003). However, Antenor is factually distinguishable from this case and Cruz-Lovo supports the Counties' position.

In Antenor, the United States Court of Appeals for the Eleventh Circuit assessed a group of bean pickers' claims under the FLSA and the Migrant and Seasonal Agricultural Worker Protection Act, and whether a joint employment relationship existed between the bean growers and the labor contractor with respect to the pickers. Antenor, 88 F.3d at 927. In ruling that a joint employment relationship did exist, the Court emphasized that the growers exercised control over the pickers in numerous ways, such as by deciding how many pickers were needed each day, the precise moment when picking would begin each day, when the pickers could stop working,

20

and which pickers to provide specific assignments.  Id. at 933-934.  The Court also recognized

that the growers supervised the pickers' work and provided direction, and that the growers had

the power to veto the labor contractor's decisions and modify employment conditions.  Id. at 935.

Finally, the Court noted that the growers purchased workers' compensation to cover the pickers,

and that they owned virtually all of the facilities and equipment used by the pickers.  Id. at 936-

937.  Considering all of this evidence, the Court concluded that the bean pickers were

economically dependent on the growers, and thus, that the growers and the labor contractor were

the pickers' joint employers.  Id. at 938.

In Cruz-Lovo, the United States District Court for the Southern District of Florida

assessed whether Ryder System, Inc. and Ryder System Federal Credit Union, for whom the

plaintiff worked as an accounting clerk, had an integrated or joint employment relationship under

the applicable FMLA regulations.  Cruz-Lovo, 298 F. Supp.2d at 1251.  In evaluating whether a

joint employment relationship existed, the Court emphasized that Credit Union had sole

managerial control over the plaintiff while it employed her, that Ryder did not have any power to

hire, fire, or modify the plaintiff's conditions of employment, that Ryder did not have any right to

determine the plaintiff's pay rate, and that the plaintiff's job was not integral to Ryder's business.

Id. at 1256-1258.  Although Ryder prepared Credit Union's payroll checks, and paid taxes and

other expenses, the Court found such facts to be nondispositive, since the actual wages paid to

the plaintiff came from Credit Union.  Id. at 1258.

Based on the foregoing case law, it is clear that the Counties were not Miller's employer

under the joint employment test.  Neither the Counties nor the other member jurisdictions have

the power to hire, fire, or supervise the Park Authority's employees.  Likewise, neither the

21

Counties nor the other member jurisdictions supervise or control the work schedules or the employment conditions of the Park Authority's employees, or determine the employees' rates of pay. While the County of Rockingham, as the Park Authority's fiscal agent, prepares the payroll checks for the Park Authority's employees, the evidence indicates that the County's function is purely administrative in nature, and that the County is completely reimbursed for the funds used for the payment of wages. Likewise, no unreimbursed County funds have ever been used to pay for any health insurance or retirement benefits provided to the Park Authority's employees. While Miller heavily emphasizes the fact that the County of Rockingham was listed as her employer on certain W-2 forms, this evidence is simply not probative of a joint employment relationship.[7] See Cruz-Lovo, 298 F. Supp. 2d at 1258 (noting that the mere fact that Ryder listed its own tax identification number on the tax forms of Credit Union employees did not establish a joint employment relationship between Ryder and the employees of Credit Union, since it did "not address any working relationship between Credit Union's employees and Ryder").

For the reasons stated, the court concludes that the Park Authority is a separate, distinct entity under 29 C.F.R. § 825.108(c)(1), and that neither of the Counties were Miller's employer under the integrated employer test or the joint employer test. Consequently, the court concludes that the Counties were not Miller's employer within the meaning of the FMLA, and that they are entitled to summary judgment.

---

[7]According to the declaration submitted from James Allmendinger, the County's Director of Finance, the County of Rockingham uses its federal tax identification number on the Park Authority's W-2 forms "only . . . as a matter of simplification, to avoid the burden and expense of Rockingham County's computer programming having to be rewritten." (Allmendinger Decl. at 3.)

## The Park Authority's Motion for Summary Judgment

Having concluded that the Park Authority was Miller's sole employer, Miller must ultimately establish that the Park Authority employed 50 or more employees within 75 miles of her worksite, in order to qualify as an "eligible employee" under the FMLA. See 29 U.S.C. § 2611(2)(B). Pursuant to 29 C.F.R. § 825.110(f), the issue of whether an employer employed 50 or more employees within 75 miles is determined on the basis of the date on which the employee gave notice of the need for leave. In this case, Miller gave notice of the need for FMLA leave on two occasions, May 20, 2004 and June 14, 2004. Thus, to decide whether Miller was an "eligible employee" under the FMLA, the court must determine whether the Park Authority had 50 or more employees on either of those dates.[8]

Pursuant to 29 C.F.R. § 825.111(c), the "determination of how many employees are employed within 75 miles of the worksite of an employee is based on the number of employees maintained on the payroll." Relying on an affidavit from Andrew Wells, its Executive Director, the Park Authority argues that it had only 40 employees on its payroll on May 20, 2004, and that it had only 46 employees on its payroll on June 14, 2004.

Wells based these numbers on the Park Authority's Personnel Directory, which was printed in October of 2006, in response to this litigation. According to Wells, the Personnel Directory indicates that there were 46 individuals who were hired by the Authority on or before May 20, 2004, who had not been terminated as of that date, and that there were 52 individuals who were hired by the Authority on or before June 14, 2004, who had not been terminated as of that date. However, Wells states that the Personnel Directory does not accurately reflect the

---

[8]There is no issue as to the 75-mile requirement; all of the Park Authority's employees work within 75 miles of the worksite in Grottoes, Virginia, where Miller worked.

23

number of individuals employed by the Authority on May 20, 2004 or June 14, 2004, because it only lists the employees' "begin work date" and "terminate date," and does not reflect changes in employment status between those dates. Consequently, Wells notes that six individuals listed in the directory were, in fact, not employed by the Park Authority on May 20, 2004 or June 14, 2004, nor did they have any type of ongoing employment relationship with the Authority at such times. One such employee was Brandon Caricofe, who Wells asserts was officially terminated on May 5, 2004, even though his termination date is listed as October 6, 2004 in the Personnel Directory.

In response to the Park Authority's motion for summary judgment, Miller has submitted affidavits from employees, which, if credited, would establish that the Park Authority had 50 or more employees on June 14, 2004, the date on which she made her second request for FMLA leave. Miller has submitted the transcript from Brandon Caricofe's deposition, during which he testified that he was working at Grand Caverns on the date on which Miller was fired, and that he quit his job because of the way in which Miller was treated. The fact that Caricofe was working for the Park Authority during the week of June 14 through June 18, 2004 is also corroborated by the affidavits of several other employees.

Miller has also identified several employees who should be added to the number of employees who were employed by the Park Authority on June 14, 2004. Although the Personnel Directory indicates that Crystal Smith was terminated as of July 5, 2003, Smith testified at her deposition that she worked at Grand Caverns during the summer of 2004, and that she stopped working at the park when she learned that Miller had been terminated. The fact that Smith was

24

working during the week of June 14 through June 18, 2004 is corroborated by the affidavits of several other employees. Likewise, Miller argues that Patrick Rodgers and Tara Taylor should be included in the number of individuals employed by the Park Authority on June 14, 2004. According to the Personnel Directory, Rodgers and Taylor were terminated on November 29, 2003. However, Miller has submitted affidavits from Rodgers and Taylor, which indicate that they worked at Grand Caverns both before and after Miller's termination. Likewise, Miller has submitted affidavits indicating that Peggy Bubb conducted park tours during the summer of 2004, both before and after Miller's termination, even though her termination date is listed as November 29, 2003 in the Personnel Directory. Finally, Miller argues that Anita and Bobby Johnson should be included in the list of individuals employed by the Park Authority. Miller has submitted deposition testimony indicating that the Johnsons worked as campground hosts for the Park Authority during the relevant time period in the summer of 2004.

Based on the foregoing evidence, the court concludes that Miller has raised a genuine issue of material fact as to whether the Park Authority employed 50 or more employees on June 14, 2004, the date on which she made her second request for FMLA leave, and thus, as to whether she was an "eligible employee" under the FMLA. Accordingly, the court will deny the Park Authority's motion for summary judgment.

### Conclusion

For the reasons stated, the Counties' motion for summary judgment will be granted, and the Park Authority's motion for summary judgment will be denied.

The Clerk is directed to send certified copies of this opinion and the accompanying order

25

to all counsel of record.

ENTER: This 9th day of August, 2007.

_____
United States District Judge

26